IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

A.J. OLIVAS, individually and on behalf of
those similarly situated,

   Plaintiff,

vs.             No. CIV 17-0022 JB\CG

C & S OILFIELD SERVICES, LLC;
DEWEY COFFMAN AND BRETT
COFFMAN,

   Defendants.

**MEMORANDUM OPINION[1]**

  **THIS MATTER** comes before the Court on the Plaintiffs' Motion for Notice to Potential

Plaintiffs and Conditional Certification, filed April 11, 2017 (Doc. 16)("Notice Motion").  The

Court held a hearing on January 25, 2018.  The primary issue is whether Plaintiff A.J. Olivas'

proposed class members are similarly situated such that the Court should authorize providing

them notice of their right to opt in to Olivas' collective action against Defendants C & S Oilfield

Services, LLC, Dewey Coffman, and Brett Coffman (collectively, "C&S Oilfield") under the

Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA").  The Court concludes that Olivas'

allegations and proposed class members' affidavits establish that he and the proposed class

---

[1]The Court previously issued an Order granting the Plaintiff's Motion for Notice to
Potential Plaintiffs Motion for Notice to Potential Plaintiffs and Conditional Certification, filed
April 11, 2017 (Doc. 16).  See Order Granting Plaintiffs' Motion for Notice to Potential
Plaintiffs and Conditional Certification, filed January 25, 2018 (Doc. 36)("Order").  In that
Order, the Court stated that it would "at a later date issue a Memorandum Opinion more fully
detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the
promised opinion.

members are similarly situated.  Accordingly, the Court grants the Notice Motion and authorizes Olivas to notify the proposed class of his collective action.

## FACTUAL BACKGROUND

C&S Oilfield is a Louisiana-based company that "provid[es] water transfer and other . . . services" to New Mexico oilfields.  Collective Class Action Complaint ¶ 18, at 4, filed January 9, 2017 (Doc. 1)("Complaint").  D. Coffman and B. Coffman are C&S Oilfield' owners.  See Complaint ¶¶ 8-9, at 3.  Olivas worked for C&S Oilfield "operat[ing] . . . oilfield equipment, completing daily checklists, and performing other manual/technical labor at oilfield sites." Complaint ¶ 19, at 5.  According to affidavits, Olivas and other C&S Oilfield employees regularly worked over eighty hours per week but did not receive overtime pay.  See Complaint ¶ 20, at 5-6; 28 U.S.C. § 1746 Declaration and Consent of A.J. Olivas in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-3) ("Olivas Aff."); 28 U.S.C. § 1746 Declaration and Consent of Eric Holloway in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-4)("Holloway Aff."); 28 U.S.C. § 1746 Declaration and Consent of Joseph Wright in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-5)("Wright Aff."); 28 U.S.C. § 1746 Declaration and Consent of Michael Ward in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-6)("Ward Aff."); 28 U.S.C. § 1746 Declaration and Consent of Wayne Reinhart in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-7)("Reinhart Aff."); 28 U.S.C. § 1746 Declaration and Consent of Roman Lambertt in Support of Proceeding as a Collective Action ¶ 4, at 2 (dated January 25, 2017), filed April 11, 2017 (Doc. 16-8)("Lambertt Aff.").

## PROCEDURAL BACKGROUND

In the Complaint, Olivas alleges that C&S Oilfield did not pay him or other workers overtime pay.  See Complaint ¶¶ 2-3, at 1-2.  He brings a class action under rule 23(b)(3) of the Federal Rules of Civil Procedure for C&S Oilfield's alleged violation of the New Mexico Minimum Wage Act, N.M. Stat. Ann. § 50-4-22(D) ("NMMWA").  See Complaint ¶ 5, at 2.  He also brings a FLSA collective action against Oilfield Services.  See Complaint ¶ 6, at 2-3.  In the Defendants' Answer to Collective and Class Action Complaint, filed March 29, 2017 (Doc. 9) ("Answer"), C&S Oilfield asserts several affirmative defenses: (i) Olivas and the putative class have failed to state a claim upon which relief can be granted; (ii) it paid its workers what they were owed, and it acted in good faith to comply with and in fact did not violate applicable law; (iii) Olivas' action should not be a collective or class action; (iv) Olivas is not similarly situated with the putative class members; (v) "any alleged violation would be subject to the *de minimus* doctrine"; (vi) Olivas and the proposed class did not work more than forty hours during any week; (v) Olivas and the proposed class have failed to mitigate their damages; (vi) it is entitled to "set off and/or credit for any amounts earned in mitigation"; (vii) it had no knowledge or reason to know that Olivas and the putative class worked in excess of forty hours per week; (viii) the statute of limitations and/or the doctrine of laches bars some or all of the claims against it; (ix) if Olivas and the putative class are entitled to overtime pay, "they would be entitled to overtime premium only"; and (x) Olivas lacks standing.  Answer ¶¶ 36-50, at 4-5.

### 1.    The Notice Motion.

In the Notice Motion, Olivas asks that the Court permit Olivas to issue a notice to "a limited group of Defendants' current and former employees" so that they can decide whether to opt in to Olivas' collective action pursuant to 29 U.S.C. § 216(b).  Notice Motion at 1-2.  Olivas defines the target group as "[a]ll field personnel employed by Defendants over the last three

years who received pay on a salary basis.  This Definition includes, but is not limited to, . . .

positions referred to by Defendants as field hands, lead hands, water transfer technicians, crew

leaders, laborers, crewmembers, tank hands, and team leaders."  Notice Motion at 4.  Olivas

asserts that, for a court to permit a plaintiff to send out a FLSA collective action notice, a

plaintiff needs to make substantial allegations or to provide some factual support that there is a

basis for a collective action.  See Notice Motion at 6.  Olivas argues he has met that standard by

providing six sworn statements from him and other C&S Oilfield employees who aver that they

and others performed similar work as Olivas performed and were also not paid for overtime.  See

Notice Motion at 6-9 (citing Olivas Aff. ¶ 4, at 2; Holloway Aff. ¶ 4, at 2; Wright Aff. ¶ 4, at 2;

Ward Aff. ¶ 4, at 2; Reinhart Aff. ¶ 4, at 2; Lambertt Aff. ¶ 4, at 2).  Olivas also asks the Court to

order C&S Oilfield to provide to Olivas the names and contact information for putative class

members.  See Notice Motion at 9.

   **2.**  **The Response.**

   C&S Oilfield responds.  See Defendant's Response to Plaintiff's Motion for Notice to

Potential Plaintiffs and Conditional Certification, filed April 24, 2017 (Doc. 19)("Response").

C&S Oilfield argues that Olivas' proposed class is too broad, because it "disregards the duties

and level of responsibility of the various job titles and positions as well as the location where

such work was performed."  Response at 3.  C&S Oilfield notes that Olivas' affidavits feature

sworn statements from lead hands, a tank hand, a hand, and a water transfer technician, but there

are no sworn statements or other evidence showing that crew leaders, laborers, crew members,

and team leaders are similarly situated to Olivas.  See Response at 4.  C&S Oilfield also argues

that Olivas' request for workers' names and contact information is too broad, and that it should

only be required to provide that information for workers who performed the same jobs as Olivas

and the workers who provided affidavits.  See Response at 4.

3.      **The Reply**.

Olivas replies.   <u>See</u> Plaintiffs' Reply in Support of Motion for Notice to Potential Plaintiffs and Conditional Certification, filed April 28, 2017 (Doc. 22)("Reply").   Olivas argues that the six sworn statements demonstrate that C&S Oilfield's policy to not pay overtime "applied to all personnel paid on a salary basis regardless of duties, location or official title." Reply at 2 (emphasis omitted).   Olivas contends that the six sworn statements "meet the lenient standard for conditional certification without additional support."   Reply at 3.   Olivas adds that at least twenty other workers "have self-identified themselves as similarly situated by filing their consents with the court," which "further establish the propriety of Notice and that Defendants failed to pay Plaintiff and all similarly situated field personnel in compliance with the FLSA." Reply at 3.   Olivas contends that the criteria for granting conditional certification to a proposed class is that the proposed class members include employees in similar positions, and that the defendants made a single decision or enforced a policy to not pay them overtime.   <u>See</u> Reply at 3-4 (citing <u>Foster v. Nova Hardbanding</u>, Civ. No. 15-1047, 2016 WL 4492829, at *2 (D.N.M. April 20, 2016)(Garza, M.J.)).   Olivas avers that, "[a]s a matter of corporate policy, Defendants classified all field personnel [that were] paid a salary as exempt from overtime without performing any individualized analysis themselves."   Reply at 4.   Further, Olivas contends that the proposed class is not overly broad, because Olivas and the class had similar job duties, and were paid pursuant to the same payment system that denied them each overtime pay.   <u>See</u> Reply at 4-5.

4.      **Supplemental Authority**.

On May 23, 2017, Olivas submitted a Notice of Supplemental Authorities.   <u>See</u> Notice of Supplemental Authorities, filed May 23, 2017 (Doc. 23)("Notice Supp. Auth.").   In the Notice Supp. Auth., Olivas notes that, since he filed his Notice Motion, two courts, including the Court

in a different proceeding, approved notice by text message.  <u>See</u> Notice Supp. Auth. at 1 (citing <u>Landry v. Swire Oilfield Servs.</u>, No. CIV 16-621, 2017 WL 1709695, at *39 (D.N.M. May 2, 2017)(Browning, J.); <u>Regan v. City of Hanahan</u>, No. CIV 16-1077, 2017 WL 1386334, at *3 (D.S.C. Apr. 17, 2017)).

     **5.**    <u>**The Hearing**</u>**.**

The Court held a hearing.  <u>See</u> Draft Transcript of Motion Proceedings (taken January 25, 2018)("Tr.").[2]  The Court stated its inclination to grant the Notice Motion.  <u>See</u> Tr. at 2:10 (Court).  C&S Oilfield revisited its argument that Olivas' affidavits are "fairly general in nature" and that the proposed class features workers performing different jobs than the affiants performed.  Tr. at 3:22-4:5 (Burns).  The parties agreed that, should the Court grant the Notice Motion, C&S Oilfield should have ten days to provide employee contact information.  <u>See</u> Tr. at 4:15-19 (Burns); <u>id.</u> at 5:16-19 (Court, Braziel).  Olivas stated that "because of the length of time the motion has been on file we may be requesting some equitable tolling to try to get the statute back in line for when we filed the motion."  Tr. at 5:19-23 (Braziel).

<u>**LAW REGARDING THE FLSA**</u>

The FLSA requires covered employers to pay a minimum wage, and to pay their nonexempt employees overtime pay of time and one half their regular rate of pay for hours worked in excess of forty in a work week.  <u>See</u> 29 U.S.C. §§ 206-207.  The FLSA provides five means of enforcement: (i) criminal prosecutions for willful violators, <u>see</u> 29 U.S.C. § 216(a); (ii) individual civil causes of action to recover unpaid minimum wages, overtime compensation and certain liquidated damages, <u>see</u> 29 U.S.C. § 216(b); (iii) collective actions to recover

---

[2]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

damages, which are basically opt-in class actions, see 29 U.S.C. § 216(b); (iv) a cause of action allowing the Secretary of the Department of Labor to recover employees' damages and for additional recovery of "an equal amount of liquidated damages," 29 U.S.C. § 216(c); and (v) a suit for injunctive relief, see 29 U.S.C. § 217. "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981)(alterations in original)(quoting 29 U.S.C. § 202(a)).

### 1.    **Employers Under the FLSA.**

The FLSA defines "employer" broadly:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203. "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship." Saavedra v. Lowe's Home Cntrs., Inc., 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010)(Browning, J.)(quoting Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33 (1961)). The Supreme Court of the United States has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA. Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 326 (1992). See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)("[T]here is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act . . . . The definition of 'employ' is broad."). The Tenth Circuit has similarly recognized that "[t]he terms 'employ' and 'employer' are given . . . broad . . . definitions." Johnson v. Unified Gov't of Wyandotte Cnty.,

371 F.3d 723, 729 (10th Cir. 2004)(Holloway, J.).

> The statute is a remedial one, written in the broadest possible terms . . . . It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)(Timbers, J.).  "Employer" includes persons or entities who have "managerial responsibilities" that give the person or entity "substantial control of the terms and conditions of the work of [its] employees."   Falk v. Brennan, 414 U.S. 190, 195 (1973).   "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA."   Saavedra v. Lowe's Home Cntrs, Inc., 748 F. Supp. 2d at 1288 (citing Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)).   See Fegley v. Higgins, 19 F.3d 1126, 1131 (6th Cir. 1994); Reich v. Circle C Inv. Inc., 998 F.2d 324, 329 (5th Cir. 1993); Donovan v. Grim Hotel Co., 747 F.2d 966, 972 (5th Cir. 1984); Donovan v. Janitorial Services, Inc., 672 F.2d 530, 531 (5th Cir. 1982); Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296, 1300 (5th Cir. 1969).

### 2.    The FLSA's Minimum Wage, Overtime, and Records Requirements.

FLSA § 7 requires employers to pay covered employees who, in a given workweek, work more than forty hours "at a rate not less than one and one-half times the regular rate at which [the employee] is employed."   29 U.S.C. § 207(a)(1).   "The purpose of FLSA overtime is 'to compensate those who labored in excess of the statutory maximum number of hours for the wear and tear of extra work and to spread employment through inducing employers to shorten hours because of the pressure of extra cost.'"   Chavez v. City of Albuquerque, 630 F.3d 1300, 1304 (10th Cir. 2011)(Briscoe, J.).  The Tenth Circuit has recognized "that a contract cannot designate

an artificially low regular rate in order to reduce the minimum statutory overtime due . . . , [as] parties cannot avoid the purposes of the FLSA by designating a fictitious regular rate." Chavez v. City of Albuquerque, 630 F.3d at 1305 (citing Walling v. Wall Wire Prods. Co., 161 F.2d 470, 473 (6th Cir. 1947)).

Under the FLSA, an employer must pay its employees for the time that it "employ[s]" them, the statutory definition of which means "to suffer or permit to work." 29 U.S.C. § 203(g). See 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.' The act, however, contains no definition of 'work.'"). "'The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's.'" United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1116 (10th Cir. 1999)(quoting Gilligan v. City of Emporia, 986 F.2d 410, 412 (10th Cir. 1993)). The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees "for all actual work . . . as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)(quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944)). The Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Armour & Co. v. Wantock, 323 U.S. at 133.

FLSA § 6 requires employers to pay their employees a minimum wage.  See 29 U.S.C. § 206(a).  Deductions from employees' paychecks, for whatever reason, that bring the employees' pay under the minimum wage violate § 6.  See Donovan v. Simmons Petrol. Corp., 725 F.2d 83, 84 (10th Cir. 1983)(holding that the employer's deductions of "cash register shortages and the amount of uncollectible checks accepted by its employees from the paychecks of employees who were on duty when the shortages occurred" was a willful FLSA violation). Cf. Dole v. Solid Waste Servs., Inc., 733 F. Supp. 895, 924 (E.D. Pa. 1989)(Huyett, J.) (concluding that deductions "for lunch breaks during which [employees were] required to continue with any duties relating to . . . work," bringing employees below minimum wage, violated the FLSA).  Further, FLSA § 11 imposes on an employer a duty to "make, keep, and preserve" records of its employees' wages, hours, and "other conditions and practices of employment" that the employer may maintain.  29 U.S.C. § 211(c).  In Donovan v. Simmons Petrol. Corp., the Tenth Circuit recognized the employers' duty under the FLSA to keep accurate records in discussing the shift of the burden to prove damages between the employee and the employer:

> The employee bears the burden of proving he performed work for which he was not properly compensated.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).  However, employers have a duty to keep accurate records.  If employers do not keep accurate records the employee's burden is extremely difficult.  In order to prevent the employee from being penalized by the employer's failure to keep adequate records, the Supreme Court held in Anderson that an employee carries his burden by proving that he has "in fact performed work for which he was improperly compensated and . . . [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Id.  Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence. If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate.  The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law.  Id. at 687-88.

Donovan v. Simmons Petrol. Corp., 725 F.2d at 85-86.  The federal Department of Labor's Wage and Hour Division requires that employers must maintain in their records the time of day and day of the week on which the employee's workweek begins, the regularly hourly pay rate for the employee in any week in which overtime compensation is due, the hours worked each workday and workweek, the total daily or weekly straight-time earned, and the total overtime. See 29 C.F.R. § 516.2(a).  Where an employer violates its § 211(c) record-keeping duties, including by not counting time worked before and after an employee's shift begins, the employer cannot meet its burden to rebut the Labor and Wage investigators' reasonable estimates of backpay due to the employees.  See U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir. 1995)("We agree with the district court's conclusion that the calculations of the investigator are a reasonable and generous estimate of the back wages due to the Defendants' employees for the pre-shift and postshift hours worked."); Metzler v. IBP, Inc., 127 F.3d 959, 965-66 (10th Cir. 1997)("When the employer has failed to record compensable time . . . , [t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [29 U.S.C. § 211(c) ].").

Section 7(a) sets forth the general rule for calculating overtime.  See 29 U.S.C. § 207(a)(1).  Because the FLSA does not put a limit "on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation . . . for hours worked in excess of the maximum workweek prescribed by section 7(a)."  29 C.F.R. § 778.102.  The statute states:

> Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified

at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  See 29 C.F.R. § 778.107 ("The general overtime pay standard in section 7(a) requires that overtime must be compensated at a rate not less than one and one-half times the regular rate at which the employee is actually employed.").  The statute's language demands that an employee receive one and one-half times the "regular rate" of pay for hours that he or she works in excess of forty in a given week.  29 U.S.C. § 207(a)(1).

One important principle is that FLSA overtime is based on the number of hours worked in a particular workweek.

> The Act does not . . . require . . . that an employee be paid overtime compensation for hours in excess of eight per day, or for work on Saturdays, Sundays, holidays or regular days of rest.  If not more than the maximum hours prescribed in the Act are actually worked in the workweek, overtime pursuant to section 7(a) need not be paid.

29 C.F.R. § 778.102.  On the other hand, that the FLSA does not require that the employer pay overtime for those hours does not relieve an employer from paying overtime for them if the contract of employment demands them.  See 29 C.F.R. § 778.102.

For purposes of calculating overtime under the FLSA, however, the only concern is whether the total hours worked in a given workweek are above or below the statutory requirement for overtime compensation.  See 29 C.F.R. § 778.102.  A second important principle about calculating overtime under the FLSA is that the employee must receive overtime pay at a rate of no less than one and one-half times the "regular rate" for which the employer employs the employee.  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)("The keystone of Section 7(a) is the regular rate of compensation.").  The Supreme Court described "the regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  Walling v. Youngerman-Reynolds Hardwood Co., 325

U.S. at 424.  Since the Supreme Court's opinion in <u>Walling v. Youngerman-Reynolds Hardwood Co.</u>, Congress has amended the FLSA to include a description of regular rate, <u>see</u> 29 U.S.C. § 207(e) (stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight statutory exceptions),[3] and the interpretive bulletins have incorporated the Supreme Court's definition, <u>see</u> 29 C.F.R. § 778.108 ("The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed -- an 'actual fact.'").  Generally, the exceptions include overtime pay and compensation that is discretionary on the employer's part.  <u>See</u> 29 C.F.R. § 779.108.

### 3.      Compensable Time Under the FLSA.

Congress enacted the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262, to define certain activities for which employers need not compensate pursuant to the FLSA.[4]  The Portal-

---

[3]The FLSA now contains a description of what is included in the regular rate, but still contains no definition precisely setting forth how it is calculated.  <u>See</u> <u>Scott v. City of New York</u>, 592 F. Supp. 2d 475, 482 (S.D.N.Y. 2008)(Scheindlin, J.)("The words 'regular rate' are not defined in the Act." (quoting <u>Walling v. Helmerich & Payne, Inc.</u>, 323 U.S. 37, 40 (1944))(internal quotation marks omitted)).

[4]The Portal-to-Portal Act provides:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . --
>
> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

to-Portal Act excludes from compensation certain preliminary and postliminary activities, like pre-shift walking and, in some cases, changing clothes and putting on specific gear.  See Steiner v. Mitchell, 350 U.S. 247, 252 (1956); Reich v. IBP, Inc., 38 F.3d 1123, 1126 (10th Cir. 1994)(holding that the donning and doffing of safety glasses, ear plugs, a hard hat, and safety shoes are non-compensable preliminary and postliminary activities).   Under Department of Labor regulations explaining the Portal-to-Portal Act, see 29 C.F.R. § 790.6 (1947), the workday begins with the "first principal activity" and ends with the last, IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005)(quoting Steiner v. Mitchell, 350 U.S. 247, 256 (1956)).

The Supreme Court clarified what constitutes a "principal activity" in IBP, Inc. v. Alvarez, 546 U.S. at 34.  It held that anything that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under the Portal-to-Portal Act, which makes it compensable.   546 U.S. at 37.   The Supreme Court noted that, to the extent that standard protective clothing and gear are "integral and indispensable" to a principal activity, the donning and doffing of those items are principal activities and are therefore compensable.  546 U.S. at 36-37.   Accordingly, the key issue to determining compensability is whether the pre-shift activities are integral and indispensable to the employee's principal activities.   See Lindow v. United States, 738 F.2d 1057, 1060 (9th Cir. 1984)(Choy, J.)(concluding that pre-shift activities may be compensable if they are an "integral and indispensable" part of the principal activities).

The Tenth Circuit has interpreted what constitutes preliminary, non-compensable

---

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a)(emphasis added).

activities.  In <u>Smith v. Aztec Well Servicing Co.</u>, 462 F.3d 1274 (10th Cir. 2006), the plaintiffs

argued that they were entitled to compensation for time spent loading their trucks with safety and

protective gear, then traveling to the job site.  <u>See</u> 462 F.3d at 1276-77.  The Tenth Circuit

acknowledged that, if the plaintiffs' first principal activity -- loading their trucks with protective

gear -- occurred before traveling to the job site, then the plaintiffs' travel time constituted

compensable work.  462 F.3d at 1289.  Nonetheless, the Tenth Circuit explained that, where

> an employee's activity "takes all of a few seconds and requires little or no
> concentration," then the activity is "properly considered not work at all."
> Moreover, "[r]equiring employees to show up at their work stations with such
> standard equipment [as a hard hat, safety glasses, earplugs, and safety shoes] is no
> different from having a baseball player show up in uniform, . . . or a judge with a
> robe."  It is simply a prerequisite for the job, and is purely preliminary in nature.
> Consequently, the plaintiffs' travel to and from the well sites was not integral and
> indispensable to their principal activities merely because they were required to
> carry their personal safety equipment along with them.

462 F.3d at 1289 (quoting <u>Reich v. IBP, Inc.</u>, 38 F.3d at 1125, 1126 n.1).  In arriving at its

decision that loading protective gear into the truck was not integral and indispensable to the

plaintiffs' job, the Tenth Circuit considered the amount of time it took and the level of

concentration.  <u>See</u> <u>Smith v. Aztec Well Servicing Co.</u>, 462 F.3d at 1290-91.  The safety

equipment was clearly required to do the job, yet the Tenth Circuit still found that it was not

integral and indispensable to the employees' principal activities.  Similarly, in <u>Reich v. IBP, Inc.</u>,

the Tenth Circuit held that putting on safety glasses, ear plugs, a hard hat, and safety shoes was

not compensable, because it "requires little or no concentration," and can easily be done while

focusing on other things.  38 F.3d at 1126.  "Thus, although essential to the job, and required by

the employer, any time spent on these items is not work."  38 F.3d at 1126.  In contrast, putting

on special protective gear that was "heavy and cumbersome," and required "physical exertion,

time, and a modicum of concentration to put them on securely and properly," was compensable,

as this donning differed in kind rather than merely degree.  38 F.3d at 1126.

Because mandatory pre-shift briefings may be integral and indispensable to an employee's principal activities, they may form the basis of an FLSA overtime violation.  That "certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable,'" however.  IBP, Inc. v. Alvarez, 546 U.S. at 40.  An activity is integral and indispensable if it is an "intrinsic element" of the employee's principal activities, and one with which the employee cannot dispense if he or she is to perform his or her principal activities.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 514 (2014).  Consequently, the Supreme Court has held that time spent waiting to don protective gear is not compensable, while time spent sharpening knives at a meatpacking plant is compensable, as dull knives would slow the assembly line production, cause waste, lead to accidents, and "affect the appearance of the meat as well as the quality."  Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518 (quoting Mitchell v. King Packing Co., 350 U.S. 260, 262 (1956)).  In other words, the employees could not perform their jobs adequately without sharpening their knives.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 514.

Recently, the Supreme Court held that time spent undergoing mandatory security screenings were not compensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 518.  The Supreme Court stated that, although the employer required employees to undergo the screenings, the screenings were not integral and indispensable to the principal task which they were paid to perform -- stocking warehouse shelves and packaging products.  See 135 S. Ct. at 519.  Importantly, the Supreme Court stated that the "Court of Appeals erred by focusing on whether an employer *required* a particular activity.  The integral and indispensable test is tied to the productive work that the employee is *employed to perform*."  135 S. Ct. at 519 (emphasis in

original).  Moreover, the Supreme Court held that it was not determinative whether the task

benefitted the employer.  See 135 S. Ct. at 519.

> [I]t is not enough to make an activity compensable under the Fair Labor Standards
> Act that the employer requires it and it is done for the benefit of the employer.
> Even activities required by the employer and for the employer's benefit are
> "preliminary" or "postliminary" if not integral and indispensable to "the
> productive work that the employee is *employed to perform*."

Balestrieri v. Menlo Park Fire Prot. Dist., 800 F.3d 1094, 1101 (9th Cir. 2015)(Kleinfeld, J.)

(emphasis in original)(quoting Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 519).

Finally, the Supreme Court reaffirmed its statement that, if the employee need not

perform a task before every shift or the task can be eliminated altogether, it is not integral and

indispensable.  See Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. at 513 (finding that an

activity was not integral and indispensable when the employees did not participate in them every

day); id. at 518 (finding that activities were not integral and indispensable if the employer could

have eliminated the required practice without impairing the employees' ability to complete their

work).  Unlike activities that are "*always* essential if the worker is to do his job," certain

activities "may or may not be necessary in particular situations or for every employee."  IBP,

Inc. v. Alvarez, 546 U.S. at 40.  When certain tasks are not necessary, the activity "comfortably

qualif[ies] as a 'preliminary' activity."  IBP, Inc. v. Alvarez, 546 U.S. at 40.

### 4. The FLSA's Remedies.

Actions to enforce the FLSA's overtime provisions are generally subject to a two-year

statute of limitations unless the violation is willful, in which case the limitations period is three

years.  See 29 U.S.C. § 255(a).  A lawsuit to enforce a cause of action for unpaid minimum

wages, unpaid overtime compensation, or liquidated damages

> may be commenced within two years after the cause of action accrued, and every
> such action shall be forever barred unless commenced within two years after the

cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .

29 U.S.C. § 255(a).  Willful violations occur when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985)).

Beyond the actual damages to cover the amount of unpaid minimum wages or overtime compensation, FLSA § 16(c) allows additional recovery of "an equal amount of liquidated damages."  29 U.S.C. § 216(c).  The Tenth Circuit has noted: "The purpose for the award of liquidated damages is 'the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" Renfro v. Emporia, 948 F.2d 1529, 1540 (10th Cir. 1991)(quoting Laffey v. Nw. Airlines, Inc., 567 F.2d 429, 463 (D.C. Cir. 1976)).  If the employer can show that the conduct giving rise to the action to recover back pay was in good faith, and that the employer had reasonable grounds to believe the conduct was lawful, the court may refuse to award some or all liquidated damages:

> Under 29 U.S.C. § 260, if in any action to recover unpaid overtime compensation an employer "shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA," the court may refuse to award liquidated damages.
>
> > All circuits that have considered the matter hold that the trial court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act.

Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d 720, 725 (10th Cir. 1984)).

The employer bears the burden to prove that the conduct was reasonable and in good faith.  See

Renfro v. Emporia, 948 F.2d at 1540.  For purposes of assessing whether the employer meets its burden, "[t]he good faith requirement mandates the employer have 'an honest intention to ascertain and follow the dictates of the Act.  The additional requirement that the employer have reasonable grounds for believing that his conduct complies with the Act imposes an objective standard by which to judge the employer's behavior.'"  Renfro v. Emporia, 948 F.2d at 1540 (quoting Doty v. Elias, 733 F.2d at 725).  See Garcia v. Tyson Foods, Inc., 890 F. Supp. 2d 1273, 1295 (D. Kan. 2012)(Marten, J.)("While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable.  If the employer meets that burden the court retains discretion whether to award liquidated damages.")(citations omitted).

FLSA § 17 provides that district courts "shall have jurisdiction, for cause shown, to restrain [FLSA] violations . . . including . . . the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . . ."  29 U.S.C. § 217(c).  The question whether a court should grant an injunction is left to the court's sound discretion.  See Mitchell v. Hertzke, 234 F.2d 183, 187 (10th Cir. 1956) ("Although it is not clearly stated in these Labor Standards Act cases that the burden of proving the need for an injunction is upon the movant[,] that is a general principle of law and applies with legal force here.").  "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.  Current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief."  Metzler v. IBP, Inc., 127 F.3d at 963 (alterations and citations omitted)(quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)); Brock v. Big Bear Market No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987).  In exercising its discretion to grant a prospective injunction after finding a previous FLSA

violation, "courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith." Metzler v. IBP, Inc., 127 F.3d at 963-64 (citing Martin v. Coventry Fire Dist., 981 F.2d 1358, 1362 (1st Cir. 1992)).

## LAW REGARDING COLLECTIVE ACTIONS UNDER FLSA § 216(b)

Under FLSA § 216(b), "any one or more employees" may bring an action to recover unpaid overtime wages "for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). This provision provides the exclusive mechanism to certify an FLSA collective action. See Prickett v. DeKalb Cnty., 349 F.3d 1294, 1296 (11th Cir. 2003)(per curiam). The United States Court of Appeals for the Eleventh Circuit has explained that "FLSA plaintiffs may not certify a class under Rule 23," because § 216(b)'s opt-in requirement demonstrates that Congress intended FLSA plaintiffs to use § 216(b). Prickett v. DeKalb Cnty., 349 F.3d at 1296. Indeed, the Tenth Circuit has reasoned, "the principal difference between a Rule 23 class action and a § 216(b) collective action is that the similarly situated employee must 'opt-in' to be bound by a judgment in a § 216(b) suit." Dolan v. Project Const. Corp., 725 F.2d 1263, 1266 (10th Cir. 1984), abrogated on other grounds by Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165 (1989). "Correspondingly, § 216(b) fails to provide for mandatory notice to similarly situated employees since no individual rights are jeopardized by the FLSA procedures." Dolan v. Project Const. Corp., 725 F.2d at 1266 (citations omitted). These differences reflect "almost diametrically opposed" policies, with rule 23's opt-out procedure enshrining a "policy of encouraging a single suit," whereas § 216(b)'s requirement of

an affirmative act by each plaintiff "tends to discourage collective litigation." Dolan v. Project Const. Corp., 725 F.2d at 1267.

Section 216(b) requires a potential collective-action member to "give his consent in writing" to become a party.  29 U.S.C. § 216(b).  Rule 23(b), by contrast, treats each person within the class description as a class member unless he or she opts out.  See Fed. R. Civ. P. 23(b).  See also Dolan v. Project Const. Corp., 725 F.2d at 1266 ("[A] Rule 23 class action [differs from] a § 216(b) collective action i[n] that the similarly situated employee must 'opt-in' to be bound by a judgment in a § 216(b) suit."); LaChapelle v. Owens Illinois, Inc., 513 F.2d 286, 289 (5th Cir. 1975)(per curiam)("There is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 216(b).").  Because of the procedural discrepancy between § 216(b) collective actions and rule 23 class actions, courts have found that FLSA § 216(b)'s opt-in procedure preempts rule 23's class-action procedure.  See, e.g., Dolan v. Project Const. Corp., 725 F.2d at 1267 (noting that § 216(b) and rule 23 are "almost diametrically opposed," and that, with § 216(b), Congress "[c]learly . . . sought to limit the nature of a class action suit based upon an alleged FLSA violation").  See also King v. Gen. Elec. Co., 960 F.2d 617, 621 (7th Cir. 1992)(Cudahy, J.)(concluding that FLSA § 16(b)'s opt-in procedure preempts rule 23's class-action procedure); Lusardi v. Lechner, 855 F.2d 1062, 1068 n.8 (3d Cir. 1988)(Hutchinson, J.)("Courts have generally recognized that Rule 23 class actions may not be used under FLSA § 16(b)."); Grayson v. K Mart Corp., 79 F.3d 1086, 1106 (11th Cir. 1996)(Garth, J.)("Congress clearly adopted the opt-in joinder procedures of Section 216(b) of the FLSA and thus impliedly rejected the Rule 23 class action procedures.").

To use § 216(b)'s collective-action mechanism, each employee who wishes to pursue his or her claims under the FLSA must affirmatively opt into the case in writing.  See 29 U.S.C. §

216(b)("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such an action is brought.").  Potential Plaintiffs must therefore obtain notice regarding the pending collective action so they can decide whether to participate.  See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. at 170.  The FLSA authorizes parties to send notice of the opportunity to opt into the collective action if members of the proposed class are "similarly situated."  29 U.S.C. §216(b).

Although the FLSA does not define the phrase "similarly situated," the Tenth Circuit has established an ad hoc approach whereby the court determines on a case-by-case basis whether proposed class' members are similarly situated.  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001).  By adopting the "similarly situated" standard, as opposed to rule 23's standard, the Tenth Circuit has found that Congress chose to authorize collective actions under a less-stringent standard than rule 23 class actions.  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1105 ("Congress clearly chose not to have the Rule 23 standards apply to class actions under the [Age Discrimination in Employment Act of 1967, § 4(a)(1), 29 U.S.C. § 623(a)(1) ("ADEA")], and instead adopted the 'similarly situated' standard.  To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 . . . would effectively ignore Congress' directive.").  See Hoffman-La Roche Inc. v. Sperling, 493 U.S. at 170 (interpreting the ADEA and concluding that, by enacting § 216(b)'s "similarly situated" language, "Congress has stated its policy that . . . plaintiffs should have the opportunity to proceed collectively").

Under the Tenth Circuit's approach, the court engages in a two-step process.  First, at the notice stage before the completion of discovery, the court makes an initial determination whether the proposed class members are "similarly situated."  Thiessen v. General Electric Capital Corp.,

267 F.3d at 1102.  This initial determination decides whether a collective action should be conditionally certified for purposes of notifying potential class members.  See Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010)(Livingston, J.); Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432.  The plaintiff bears the burden of demonstrating that he or she is "similarly situated" to the other potential class members; however, this burden is not great.  A plaintiff "need only describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist."  Schwed v. Gen. Elec. Co., 159 F.R.D. at 375-76.  See Renfro v. Spartan Computer Servs., Inc., 243 F.R.D. at 432 (concluding that the notice stage requires nothing more than substantial allegations that the proposed class members were together the "victims of a single decision, policy or plan").

Courts of Appeals which have considered the meaning of "similarly situated" have consistently concluded that the phrase requires a minimal showing.  E.g., Myers v. Hertz Corp., 624 F.3d at 555 (requiring the plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law'")(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997)(Sotomayor, J.)); Morgan v. Family Dollar Stores, Inc., 551 F.3d at 1260 ("Under § 216(b), courts determine whether employees are similarly situated -- not whether their positions are identical.").  The plaintiff must support this "modest factual showing," Dybach v. State of Fla. Dep't of Corrections, 942 F.2d 1562, 1567 (11th Cir. 1991)(Kaufman, J.), "but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist," Myers v. Hertz Corp., 624 F.3d at 555 (emphasis in original)(citing Hoffmann v. Sbarro, Inc., 982 F. Supp. at 261).  The United States Court of Appeals for the Fifth Circuit has described the standard for conditional certification at this stage

as "lenient," typically resulting in class certification.  Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 (5th Cir. 1995), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

The second step occurs at the close of discovery, after all potential plaintiffs have opted into the action.  See Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1103.  See also Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006)(Boggs, J.).  At this stage, often prompted by a motion to decertify, the court "makes a second determination, utilizing a stricter standard of 'similarly situated.'"  Thiessen v. General Electric Capital Corp., 267 F.3d at 1102-03 (citation omitted).  This determination requires that the court evaluate several factors, including: (i) individual plaintiffs' "disparate factual and employment settings"; (ii) the defendants' various defenses "which appear to be individual to each plaintiff"; and (iii) fairness and procedural considerations.  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102-03.

## ANALYSIS

The Court concludes that Olivas' allegations and proposed class members' affidavits establish that he and the proposed class members are similarly situated.  Accordingly, the Court grants the Notice Motion and authorizes Olivas to notify the proposed class of his collective action.

The Court may conditionally certify a proposed class and authorize § 216(b) collective action notice when the proposed class members are "'similarly situated.'"  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102 (quoting 29 U.S.C. § 216(b)).  The Tenth Circuit instructs its district courts to make this determination by considering, on an *ad hoc* case-by-case basis," whether the workers were each "'victims of a single decision, policy, or plan.'"  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102 (quoting Bayles v. Am. Med. Response of Colorado, Inc.,

950 F. Supp. 1053, 1066 (D. Colo. 1996)(Babcock, J.), on reconsideration, 962 F. Supp. 1346 (D. Colo. 1997)).  At the notice stage, the conditional certification standard is "lenient," Mooney v. Aramco Servs. Co., 54 F.3d at 1214, requiring the plaintiff to make "'nothing more than substantial allegations'" that the workers are similarly situated.  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102 (quoting Bayles v. Am. Med. Response of Colorado, Inc., 950 F. Supp. at 1066).

Olivas makes substantial allegations that the proposed class members are each victims of a single employer policy.  In the Notice Motion, Olivas asserts that he and other field personnel regularly worked more than forty hours per week, but were never paid for overtime hours.  See Notice Motion at 2.  Olivas alleges that C&S Oilfield "misclassified" its salaried field personnel as being exempt from overtime pay.  Notice Motion at 1-2.  According to their affidavits, they regularly worked more than eighty hours per week, but were not paid for overtime.  See Olivas Aff. ¶ 4, at 2 ("During my employment as an Oilfield Worker, I regularly worked more than 80 hours per week . . . [and] C&S paid me on a salary basis and denied me overtime pay."); Holloway Aff. ¶ 4, at 2 (same); Wright Aff. ¶ 4, at 2 (same); Ward Aff ¶ 4, at 2 (same); Reinhart Aff. ¶ 4, at 2 (same); Lambertt Aff. ¶ 4, at 2 (same).

Olivas also makes substantial allegations that he and other C&S Oilfield workers are employees with similar positions.  Olivas and five other workers submit affidavits swearing that their positions as field personnel involved manual and technical labor, did not require that they have advanced degrees, and did not involve any supervisory duties.  See Olivas Aff. ¶ 3, at 1-2 (stating that he performed "manual and technical labor to provide water transfer and other oilfield services" and that C&S Oilfield "did not require me to have an advanced degree to work as an Oilfield Worker or to perform the technical, physical, and largely manual job duties");

Holloway Aff. ¶ 3, at 1-2 (same); Wright Aff. ¶ 3, at 1-2 (same); Ward Aff. ¶ 3, at 1-2 (same); Reinhart Aff. ¶ 3, at 1-2 (same); Lambertt Aff. ¶ 3, at 1-2 (same).  The affiants believe that there are about fifty C&S Oilfield employees who performed similar tasks and were also not paid overtime.  See Olivas Aff. ¶ 5, at 2; Holloway Aff. ¶ 5, at 2; Wright Aff. ¶ 5, at 2; Ward Aff ¶ 5, at 2; Reinhart Aff. ¶ 5, at 2; Lambertt Aff. ¶ 5, at 2.  In light of conditional certification's lenient standard, Olivas' allegations that C&S Oilfield systematically denied overtime pay to its field personnel, and the workers' sworn statements that field personnel performed similar tasks and were denied overtime pay, the Court concludes that Olivas has provided substantial allegations that his proposed class members are similarly situated.

C&S Oilfield argues that the proposed class definition is too broad, because it "disregards the duties and level of responsibility of the various job titles and positions as well as the location where such work was performed."  Response at 3.  Olivas requests conditional certification for "[a]ll field personnel employed by Defendants over the last three years who received pay on a salary basis . . . .  includ[ing], but . . . not limited to . . . field hands, lead hands, water transfer technicians, crew leaders, laborers, crewmembers, tank hands, and team leaders."  Notice Motion at 4.  C&S Oilfield contends that the term "field personnel" is too broad and ignores the differences between oilfield workers.  Response at 3-4.  C&S Oilfield also argues that the affiants' descriptions of field personnel's duties are too general.  See Tr. at 3:17-4:5 (Burns) (arguing that the affiants "don't describe what these individuals did other than they did general manual labor").

The proposed class is not too broad.  The conditional certification standard is that the workers are similarly situated, i.e., that they were "'victims of a single decision, policy, or plan.'"  Thiessen v. Gen. Elec. Capital Corp., 267 F.3d at 1102 (quoting Bayles v. Am. Med.

Response of Colorado, Inc., 950 F. Supp. at 1066).  The Court recognizes that a Field Hand and, say, a Tank Hand, may not perform precisely the same tasks, but that proposed class members held different job titles does not mean that they are not similarly situated.[5]  According to the affidavits, the differences among field personnel jobs are superficial: whatever the job title, they each shared the "same primary duties," i.e., they performed manual and technical labor on oilfields, and did not make any hiring or operational decisions.  Olivas Aff. ¶ 3, at 1-2; Holloway Aff. ¶ 3, at 1-2; Wright Aff. ¶ 3, at 1-2; Ward Aff. ¶ 3, at 1-2; Reinhart Aff. ¶ 3, at 1-2; Lambertt Aff. ¶ 3, at 1-2.  C&S Oilfield does not give the Court sound reason to conclude that Olivas has failed to meet the lenient standard of providing substantial evidence that field personnel are similarly situated.

C&S Oilfield also argues that Olivas' request for a list of names and contact information for potential class members is too broad.  See Response at 4.  C&S Oilfield argues that, if the Court conditionally certifies the class and orders C&S Oilfield to provide employee names and contact information, it should do so only for the workers who held the same job titles as the affiants did, see Response at 3-4, i.e., for Hands, Lead Hands,[6] Tank Hands, and Water Transfer

---

[5]The Court has wondered if Field Hands are what is called roustabouts, see Offshore Co. v. Robison, 266 F.2d 769, 771 (5th Cir. 1959)("A roustabout is a general handyman in the oil fields, subject to any kind of duty involving manual labor"), and if Tank Hands are what is called pumpers, see Perry v. George P. Livermore, Inc., 165 S.W.2d 782, 784 (Tex. Civ. App. 1942) ("The pumper engages in oiling the pump each day and doing any other necessary work around the well.  In the event that the pump stops (at any time during the day or night) the pumper must start it up again.").  Young workers often start as roustabouts, doing the hard labor of laying flow lines, digging ditches, and performing maintenance, and, over time, graduate to being pumpers, who monitor and maintain pumping equipment and gauge tanks.  If the Court is picturing these workers correctly and accurately, there is not so much difference between them to preclude the Court from labeling them similarly situated.

[6]The Court thinks Lead Hands may be like the gang pushers, who are lead roustabouts for a roustabout crew.

Technicians,[7] but not for Field Hands, Crew Leaders, Laborers, Crewmembers, or Team Leaders. According to their affidavits, Olivas and Ward worked as Hands, see Olivas Aff. ¶ 2, at 1; Ward Aff. ¶ 2, at 1; Holloway and Reinhart worked as Lead Hands, see Holloway Aff. ¶ 2, at 1; Reinhart Aff. ¶ 2, at 1; Wright worked as a Tank Hand, see Wright Aff. ¶ 2, at 1; and Lambertt worked as a Water Transfer Technician, see Lambertt Aff. ¶ 2, at 1.  C&S Oilfield argues that, if the Court orders C&S Oilfield to provide a list of all field personnel, rather than just for Hands, Lead Hands, Tank Hands, and Water Transfer Technicians, "the Plaintiffs action becomes one of seeking a conditionally-certified class for the purpose of finding other plaintiffs, which is improper."  Response at 4 (citing Parker v. Rowland Express Inc., 492 F. Supp. 2d 1159, 1166 (D. Minn. 2007)(Kyle, J.).  In Parker v. Rowland Express Inc., the court stated that "an FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join the action," and that "it is not unreasonable to require Plaintiffs to submit evidence of additional drivers who desire to join this litigation before conditional certification is granted." 492 F. Supp. 2d at 1166.  See also Mackenzie v. Kindred Hosps. E., L.L.C., 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003)(Merryday, J.)("[U]nsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify notice."); Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 267 (D. Minn. 1991)(Alsop, C.J.)("[T]his court feels a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted.").  Here, there is no concern that Olivas requests a list of field personnel to find people to solicit, because Olivas has provided evidence that many workers are interested in joining the action.  With the Notice

---

[7]The Court thinks Water Transfer Technicians may be like water haulers, driving water trucks and disposing of produced water or bringing fresh water to a well site.

Motion, Olivas provides affidavits from five other workers stating that C&S Oilfield did not pay them overtime for similar work.  See Olivas Aff. ¶ 4, at 2; Holloway Aff. ¶ 4, at 2; Wright Aff. ¶ 4, at 2; Ward Aff. ¶ 4, at 2; Reinhart Aff. ¶ 4, at 2; Lambertt Aff ¶ 4, at 2.  Meanwhile, twenty-six workers have already consented to be party plaintiffs in this action.[8]  Consequently, Olivas' request for field personnel names and contact information is proper, because he has already identified many party plaintiffs.

IT IS ORDERED that: (i) the Plaintiffs' Motion for Notice to Potential Plaintiffs and Conditional Certification, filed April 11, 2017 (Doc. 16), is granted; (ii) the Court enters the

---

[8]See Eric Holloway Notice of Consent to be a Party Plaintiff, filed January 9, 2017 (Doc. 2-1); Joseph Wright Notice of Consent to be a Party Plaintiff, filed January 9, 2017 (Doc. 2-2); Michael Ward Notice of Consent to be a Party Plaintiff, filed January 9, 2017 (Doc. 2-3); Mason Berube Notice of Consent to be a Party Plaintiff, filed February 6, 2017 (Doc. 4-1); Roman Lambertt Notice of Consent to be a Party Plaintiff, filed February 6, 2017 (Doc. 4-2); Christopher Perkins Notice of Consent to be a Party Plaintiff, filed February 6, 2017 (Doc. 4-3); Aaron Delrie Notice of Consent to be a Party Plaintiff, filed April 4, 2017 (Doc. 11-1); Harlon Reese Morgan Notice of Consent to be a Party Plaintiff, filed April 4, 2017 (Doc. 11-2); Casey Partridge Notice of Consent to be a Party Plaintiff, filed April 4, 2017 (Doc. 11-3); Colton Ray Pleasant Notice of Consent to be a Party Plaintiff, filed April 4, 2017 (Doc. 11-4); Logan Joseph Stephens Notice of Consent to be a Party Plaintiff, filed April 4, 2017 (Doc. 12-1); Justin Bush Notice of Consent to be a Party Plaintiff, filed April 5, 2017 (Doc. 13-1); Michael Eric Williams Notice of Consent to be a Party Plaintiff, filed April 5, 2017 (Doc. 13-2); Jay Allen Woitas Notice of Consent to be a Party Plaintiff, filed April 5, 2017 (Doc. 13-3); Tyler Belsha Notice of Consent to be a Party Plaintiff, filed April 6, 2017 (Doc. 14-1); Colton King Notice of Consent to be a Party Plaintiff, filed April 6, 2017 (Doc. 14-2); Bryan Laughlin Notice of Consent to be a Party Plaintiff, filed April 6, 2017 (Doc. 14-3); Cody Michael Marcotte Notice of Consent to be a Party Plaintiff, filed April 6, 2017 (Doc. 14-4); Robert Ted Laughlin Notice of Consent to be a Party Plaintiff, filed April 7, 2017 (Doc. 15-1); Charles Dowden Notice of Consent to be a Party Plaintiff, filed April 13, 2017 (Doc. 18-1); Cody LeFort Notice of Consent to be a Party Plaintiff, filed April 13, 2017 (Doc. 18-2); Jared Parker Notice of Consent to be a Party Plaintiff, filed April 13, 2017 (Doc. 18-3); Trenton Northam Notice of Consent to be a Party Plaintiff, filed May 26, 2017 (Doc. 24-1); Logan Stephens Notice of Consent to be a Party Plaintiff, filed May 26, 2017 (Doc. 24-2); Cody Compton Notice of Consent to be a Party Plaintiff, filed August 20, 2017 (Doc. 27-1); Tyler Michiels Notice of Consent to be a Party Plaintiff, filed September 27, 2017 (Doc. 29-1).

Order Granting Plaintiffs' Motion for Notice to Potential Plaintiffs and Conditional Certification,

filed January 25, 2018 (Doc. 36).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

J. Derek Braziel
Travis Andrew Gasper
Jesse Hamilton Forester
Lee & Braziel LLP
Dallas, Texas

--and--

Jack L. Siegel
Siegel Law Group PLLC
Dallas, Texas

      *Attorneys for the Plaintiff*

Clara B. Burns
Kemp Smith LLP
El Paso, Texas

      *Attorneys for the Defendants*